IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

WILLIAM MCNAUGHT,               )
                                )
        Plaintiff,              )
                                )
           v.                   )    1:12cv533 (JCC/TRJ)
                                )
VIRGINIA COMMUNITY COLLEGE      )
SYSTEM, NORTHERN VIRGINIA       )
COMMUNITY COLLEGE,              )
                                )
        Defendant.              )


## M E M O R A N D U M   O P I N I O N

This matter is before the Court on Defendant Virginia
Community College System, Northern Virginia Community College's
("NVCC") Motion for Summary Judgment.  [Dkt. 24.]  For the
following reasons, the Court will grant Defendant's Motion for
Summary Judgment.

### I.  Background

This case arises out of a national origin
discrimination claim and a retaliation for prior protected
activity claim by Plaintiff William McNaught, an adjunct
economics professor at NVCC, based on NVCC's failure to select
him for a full time permanent faculty position in 2010 and its
failure to select him for adjunct instructor positions for the
Summer and Fall 2012 terms.

A.   Factual Background

1.   The Parties

Plaintiff William McNaught ("Plaintiff" or "McNaught") was born in the United States and identifies his national origin, ancestry, and ethnicity as being from the United States and European. (Pl. Opp. [Dkt. 29] at 2, ¶ 1; Second Am. Compl. ¶ 4.) McNaught has a Ph.D. in Economics from Harvard University. (Pl. Opp. at 3, ¶ 2.) McNaught began teaching approximately 38 years ago and has 16 years of teaching experience overall. (*Id.* at 3, ¶ 5.) McNaught has worked as an adjunct instructor for NVCC since 2005. (Def. Mem. [Dkt. 25] ¶ 2.) The student evaluations of his teaching at NVCC are good and in line with other good faculty evaluations. (Pl. Opp. at 3, ¶ 4.) McNaught has taught at a number of other schools in addition to NVCC, including Harvard, the United States Naval Academy, George Mason University, John Hopkins University, Georgetown University, Audrey Cohen College, and Catholic University. (Pl. Opp. at 3, ¶ 5.) He has received recognition from George Mason University for his high student course evaluation ratings. (*Id.* at 3, ¶ 6; July 9, 2012 Mem. from Muir to McNaught [Dkt. 29-6].) McNaught also worked as an economist at two major consulting firms, a large international philanthropy, and the U.S. Government Accountability Office. (Pl. Opp. at 3, ¶ 7.)

Defendant NVCC is a public community college which is part of the Virginia Community College System.  The Alexandria campus, the campus at issue in this case, is one of several NVCC campuses.  (Def. Mem. ¶¶ 1, 4.)  NVCC serves a racially and ethnically diverse student population, and minority groups currently cumulatively constitute a majority of the students. (Def. Mem. ¶ 5.)  The Alexandria campus has the most diverse student population.  (Pl. Opp. at 4, ¶ 12.)

2.  <u>Facts Relating to Alleged National Origin Discrimination</u>

a.  <u>NVCC's Faculty Selection Policy and General Process</u>

It is undisputed that one of NVCC's goals is for its faculty to become more diverse in order to better resemble the student body, and that NVCC has indicated that it is "highly desirable" that it has a diverse pool of candidates from which to select during the recruitment of new faculty.  (Def. Mem. ¶ 5; Pl. Opp. at 6, ¶ 6).

Defendant has presented testimony from its President, Dr. Templin, that although he has emphasized the importance of having a diverse pool of candidates whenever possible, he has not instructed that any particular group be included or excluded in the selection of candidates.  (Def. Mem. ¶ 6-7.)  Templin also testified that he has made it clear that the candidates must meet the qualifications for the position, that the final

3

candidate should be the best qualified, and that the guiding point for the selection process should be "teaching excellence." (*Id.*)[1]  According to the Dean of Liberal Arts (formerly Dean of Humanities and Social Sciences), Dr. McClellan, he understood the President's message to mean that NVCC should use the recruitment of candidates and broad advertisement of openings in various media to work towards the goal of having a more diverse faculty.  (*Id.* ¶ 9.)  McClellan testified that they were never advised to make faculty hire choices dependant on a candidate's race, color, or national origin.  (*Id.*)

   According to McClellan, NVCC uses the following process to select a permanent faculty member.  The relevant division of the college writes a notice of vacancy and includes the qualifications sought.  The Human Resources department edits and posts all vacancy notices submitted, determines a closing date, and advertises the position.  NVCC accepts applications from all sources.  (Def. Mem. ¶ 10.)  Although McClellan's declaration also states that the application does not request, and the applicants do not supply, any indications of national origin (*id.*), McNaught has presented evidence showing that applications for faculty positions did solicit information

---

[1] The Court notes that McNaught's attempt to dispute this testimony only presents facts consistent with the statement that NVCC has a goal of increasing the diversity of its faculty.  Contrary to McNaught's insinuation, such a goal does not necessarily contradict the President's statements that NVCC also seeks to hire the best qualified candidates.

connected to national origin in the form of the applicants'
ethnicities.  (Pl. Opp. at 16, ¶ 10; Pl. Ex. 8, McNaught App.
[Dkt. 29-8] at 2; Pl. Ex. 9, Seck App. [Dkt. 29-9] at 2; Pl. Ex.
15, Gandhi App. [Dkt. 30-3] at 2; Pl. Ex. 17, Biswas App. [Dkt.
30-5] at 2; Pl. Ex. 18, Wodajo App. [Dkt. 30-6] at 2.)

        According to McClellan, the dean appoints a committee
of five to seven faculty members, including members within and
outside of the discipline which has the vacancy in question.
The committee receives access to screen all the applications
upon the closing date of the application period.  The committee
may create and use a matrix based on hiring priorities in order
to evaluate the applications.  The applicants with the highest
total points are selected to receive interviews.  The committee
submits a list of five to eight candidates to be interviewed to
Human Resources, which approves the list of interviewees.  Then,
each interviewee receives an approximately hour-long interview
which includes an identical set of questions.  During the
interview, each candidate presents a teaching demonstration.
After the teaching demonstration, the committee presents the
candidate with a question and the candidate's answer to it
constitutes the candidate's writing sample.  After the committee
reviews the candidates on their written submissions (including
their resume, cover letter, and interview question writing
sample), their expertise, and their skills exhibited during the

teaching demonstration and interview, it advises the dean of a
preferred list of three or less candidates.  The dean then
confers with the provost, provides for additional interviews if
necessary, and then makes a recommendation of one individual.
After Human Resources verifies the individual's credentials, the
individual is presented to the president for approval and
appointment.  (Def. Mem. ¶ 10.)  The president is not involved
in the hiring process until this final step.  (*Id.* ¶ 11.)

> b.   McNaught's Prior Non-Selections For
>      Faculty Position

Beginning in 2007, McNaught unsuccessfully applied for
three economics faculty positions at NVCC prior to his
application for the position at issue in this case.  (Pl. Opp.
at 4-5, ¶¶ 13-16.)  First, in 2007, McNaught applied for an
economics instructor position which Dr. Naveen Sarna, a native
of India, ultimately received.  (*Id.* at 4, ¶ 14.)  Second, in
2009, McNaught applied for an economics instructor position
which Dr. Min, a native of Korea, received.  (*Id.* at 4, ¶ 15.)

Third, in July 2010, McNaught applied for a nine-month
restricted faculty position (Position # 1526 (F0R43)).  (*Id.* at
5, ¶ 16.)  The job announcement for that position did not
mention non-western research experience as a requirement.  (*Id.*
at 5, ¶ 23.)  McNaught's application for that position
identified his ethnicity as "White (not Hispanic or Latino)."

(*Id.* at 5, ¶ 17.)  In its evaluation of his application for this position, the NVCC selection committee concluded that McNaught had a good background and teaching experience but lacked non-western research experience.  (*Id.* at 5, ¶¶ 22, 24.)  McNaught did not receive an interview or an offer for that position. (*Id.* at 5, ¶ 18.)

        The candidate selected for that position was Mr. Moduine Seck, a native of Senegal who identified his ethnicity on the application as "Black or African American (Not Hispanic or Latino)."  (*Id.* at 5, ¶ 19-20).  Mr. Seck does not have a Ph.D.  (*Id.* at 5, ¶ 21.)  However, he received his undergraduate degree from the Sorbonne and has two masters degrees, one in economics and one in statistical science.  (Pl. Ex. 9, Seck. App. [Dkt. 29-9] at 4.)  Seck also indicated that he spoke four languages on his application.  (*Id.* at 5.)  Moreover, Seck had some teaching experience in the NVCC system (*id.*), during which his teaching performance was rated "superior in all . . . aspects (Pl. Ex. 14, Mem. from McClellan to Templin [Dkt. 30-2] at 2).  Dr. McClellan stated that he recommended Seck as the candidate because NVCC was seeking a candidate who could teach international students about economic development in Africa, Latin America and Asia.  (Pl. Ex. 12, Email from McClellan to Coles [Dkt. 29-12] at 2.)  McClellan indicated that Seck's background and his studies at NVCC in its English-as-a-Second-

Language program well prepared him to relate to NVCC's students. (*Id.*) McClellan also noted in his recommendation of Seck to President Templin that the Alexandria campus of NVCC had many students from west Africa. (Pl. Ex. 14 at 2.) In addition, McClellan stated in that recommendation that Seck received the highest score out of the candidates on his technology skills and knowledge of software applications related to the field of economics. (*Id.*)

### c. The December 2010 Faculty Position (Position # 1769)

#### i. The Position Description

The position at issue in this case was a nine-month faculty position, teaching position Reference ID # 1769, Position F0874 ("Position # 1769"). (Def. Mem. ¶ 14.) Consistent with NVCC's faculty selection process described above, the job description and requirements were formulated by NVCC's Human Resources department. (*Id.* ¶ 15.) The job requirements included that "[s]uccessful candidates will demonstrate a commitment to teaching excellence." (*Id.* ¶ 21.)

#### i. NVCC's Application Review Process

The selection and interview committee for Position #1769 consisted of Dr. John Min, Dr. Naveen Sarna, Dr. Jack Lechelt, Dr. Nicholas Spencer, and Ms. Brook Miles, with Min serving as the committee's chair. (Def. Mem. ¶ 17-18.) During

the process, the committee met three or four times.  (*Id.* ¶ 19.)
NVCC received approximately 70 applications for the position and
reviewed around 60 of those.  (*Id.* ¶ 22.)  It is undisputed that
after the time for submitting applications had closed, the
committee did not solicit or accept additional information, as a
matter of fairness to all applicants.  (*Id.* ¶ 38.)

    The parties dispute some of the details of the pre-
interview review process for the position.  According to NVCC,
in reviewing the applications, the committee looked for
applications with the following factors: great teaching
references; a demonstration of relevant teaching accomplishments
such as professional workshops and awards for teaching; passion
about teaching; currentness with teaching techniques; and
ability to communicate with students.  (*Id.* ¶ 22.)  To evaluate
the applications, the committee used a matrix which included
scores for "degrees," "teaching experience and relevance,"
"evidence of outstanding teaching," "teaching diverse
populations," "quality of written application," "professional
academic achievement," "professional non-academic achievement,"
and "use of education technology," as well as room to comment on
the submissions.  (*Id.* ¶ 24.)  The committee split the
applications by alphabetical order, with Drs. Sarna and Lechelt
reviewing applications from candidates with last names from the

second half of the alphabet, including McNaught's application.[2] (*Id.* ¶ 23.)   After the chair, Dr. Min, gathered the completed matrices, the committee members had the opportunity to advocate for the top four individuals who scored the highest.   (*Id.* ¶ 25.)

According to McNaught, the committee members gave differing statements regarding their review of the applications. (Pl. Opp. at 17, ¶ 22.)   McNaught asserts that the committee members disagreed on what was needed from the candidates to show evidence of outstanding teaching.   (*Id.* at 9, ¶ 46.)   He submits testimony from Drs. Min, Lechelt, Spencer, and Sarna.   According to Dr. Min, beyond a candidate's competency in economics, the committee was looking for things like great teaching references, demonstrated teaching relevance, attendance at professional workshops, awards for teaching, passion for pedagogy, and currentness with teaching techniques.   (*Id.* at 9, ¶ 47.) According to Dr. Lechelt, evidence of outstanding teaching included longevity in teaching, high marks from colleagues, good student evaluations, and the ability to captivate students. (*Id.* at 9, ¶ 48.)   According to Dr. Spencer, evidence of outstanding teaching included student evaluations and recommendations from a vice dean or member of the faculty

---

[2] McNaught does not successfully contest this particular assertion by NVCC, as the testimony to which he cites only suggests that Dr. Lechelt and Spencer did not remember clearly which specific set of applications they reviewed. (Pl. Opp. at 17, ¶ 23.)

involved in evaluating the candidate's performance at their school. (*Id.* at 9, ¶ 49.)  According to Dr. Sarna, the committee looked for documents to show that the applicant was highly qualified in interacting with students and that he had achieved excellence in teaching, documents such as letters of reference from previous jobs indicating that the applicant had done an excellent job. (*Id.* at 9, ¶ 50; Pl. Ex. 24, Sarna Dep. [Dkt. 31-6] 12:15-19, 13:2-14.)

        ii.    <u>Finalist Interviews and</u>
                      <u>Selection of Dr. Gandhi</u>

The committee was near the end of the committee process by the end of March 2011 or early April 2011. (Min Decl. [Dkt. 24-1] ¶ 12.)  On March 31, 2011, Dr. Min sent a finalized list of six interview candidates to Dean McClellan, a list which did not include McNaught. (Def. Ex. 4 [Dkt. 24-3] at 26.)  According to NVCC, around April 4, 2011, Dean McClellan asked the committee to carefully review McNaught's application one more time. (Min Decl. ¶ 12.)  McClellan requested the second review of McNaught's application in order to ensure the committee had followed due diligence in considering him and that his application was not being overlooked, because McNaught had sought faculty membership previously and because he might protest the selection process. (*Id.;* McClellan Decl. [Dkt. 24-1] ¶ 7.)  McNaught, however, points to deposition testimony by

McClellan that he did not recall asking Min to have the committee re-review McNaught's application.  (Pl. Ex. 13, McClellan Dep. [Dkt. 30-1] 49:8-19, 50:11-21.)

The committee ultimately interviewed four candidates: Anindya Biswas, Alka Gandhi, Dennis Charles McCornac, and Tedesse Biru Wodajo.  (*Id.* ¶ 25.)  The committee made the decision not to interview McNaught for the position.  (*Id.* ¶ 34.)  Three of the interviewees did a classroom demonstration for the committee members during their interview.  (*Id.* ¶ 27.)

On April 28, 2011, the committee forwarded four names for Dean McClellan's consideration.  (*Id.* ¶ 32.)  The top three candidates on this report to the Dean were Gandhi, McCornac, and Biswas.  (*Id.* ¶ 41.)  Although Dr. Min, the committee chair, preferred McCornac, a majority of the committee members made Gandhi their first choice.  (*Id.* ¶ 42.)  Based on meeting McCornac during his interview, Dr. Min could surmise that McCornac's ethnicity was Irish American or that he was otherwise Caucasian-American.  (*Id.* ¶ 39.)  Although not ultimately selected, as one of top three finalists, McCornac was close to being NVCC's choice for the faculty position.  (*Id.*)

According to NVCC, Gandhi was the strongest applicant from the candidate pool for the following reasons.  Gandhi had a Ph.D. in economics.  In addition, she had earned extensive praise for her teaching skills in the classroom, as evidenced by

a Junior Faculty Award for Teaching Excellence at her previous school, Lycoming College, and by reference letters submitted from her peers there in support of her credentials as an accomplished, effective instructor.  NVCC also indicates that the committee members praised the quality of her interview teaching demonstration and were impressed by her responses to questions and confidence during the interview.  (*Id.* ¶ 43.) McNaught, however, disputes the conclusion that Gandhi was the strongest applicant by noting his own Ph.D. from Harvard, his greater amount of teaching experience than Gandhi, and his teaching experience at NVCC itself.  (Pl. Opp. at 18, ¶ 43.) On May 3, 2011, McClellan recommended the appointment of Dr. Gandhi.  (Def. Mem. ¶ 33.)

> iii.   McNaught's Application and NVCC's Review

McNaught applied for Position # 1769 on or around December 13, 2010.  (Def. Mem. ¶ 14.)  In his cover letter to his application, McNaught included the following statement:

> Before closing, I should address the previous rejections of my earlier applications.  The most recent rejection (August 2010) I have learned was because the selection committee thought I had no international experience.  I have a lot of international experience but did not list it in my application because it was not specified in the job announcement. Presuming I had no such experience, the search committee chose instead a candidate who does not hold a Ph.D. and was a recent

> immigrant from Africa needing ESL
> instruction to teach in English. I
> understand that NVCC takes its affirmative
> action obligations seriously and the
> implications of choosing a black male
> candidate over a white male candidate. It
> is a prevalent rumor at the Alexandria
> campus that only black and female candidates
> are being chosen for positions.
> Identification of international experience
> as a prerequisite for positions is of course
> one method of favoring the hiring of
> immigrants who perhaps hold only green cards
> over naturally born U.S. citizens who have
> been residents of the state of Virginia for
> 29 years. In my last application, coming
> after 2 previous rejections that I suspected
> were the result of affirmative action
> considerations, I pointedly noted that I
> satisfy three important affirmative action
> goals, namely I am a Vietnam-era veteran, I
> am over 40 and I am partially disabled due
> to the bus accident mentioned above. I am
> painfully aware that none of these
> affirmative action classifications is
> accorded status in the NVCC affirmative
> action plan but believe these facts should
> receive due consideration when the final
> selection is made.

(Def. Ex. 1, McNaught App. [Dkt. 24-3] at 2; Def. Mem. ¶ 16.)

McNaught did not include any examples of commendations for exemplary teaching instruction in his application. (Def. Mem. ¶ 35.) McNaught also did not include any letters of reference. (*Id.* ¶ 37.) He did note in his cover letter that:

> During the past five years my service at the
> Alexandria campus has been exemplary. I
> have twice picked up teaching loads for
> full-time instructors who decided at the
> last minute to take a semester off and have
> always completed every assignment I have
> accepted. I am aware that the Alexandria

14

> Dean contends that I accepted then dropped
> out of an offered position in July 2007.  I
> can conclusively demonstrate that no such
> offer ever took place.

(Def. Ex. 1, McNaught App. at 2.)

The parties disagree about the facts associated with the evaluation of McNaught's application.  According to NVCC, McNaught was not selected as a finalist-interviewee or the ultimate candidate for several reasons.  NVCC asserts that the two committee members who reviewed McNaught's application respectively gave him a score of 13 and 15 (out of a highest possible score of 22) on the matrix used to evaluate candidates, scores which did not place him among the top four candidates.  (Def. Mem. ¶ 25; Def. Exs. 14, 15 [Dkt. 24-3].)  Those same committee members respectively gave Gandhi, the candidate selected for the position, a 20 and 19 on the matrix.  (Def. Exs. 14, 15.)[3]   Relatedly, NVCC contends that one significant reason that McNaught was not favored was that his application

---

[3] The matrices contained the following scores and totals for McNaught and Gandhi:

| Points | Degrees 0 to 5 | Teaching Exper. & Relevance 0 to 5 | Evid. of Outstanding Teaching 0 to 1 | Teaching Diverse Pops. 0 to 1 | Written Qual. of App. 0 to 3 | Prof. Ach. (Acad.) 0 to 1 | Prof. Ach. (Non-Acad.) 0 to 3 | Use of Educ'l Tech. 0 to 3 | Total O to 22 |
|---|---|---|---|---|---|---|---|---|---|
| Mc-Naught Mat. 1 | 5 | 5 | 1 | 1 | 0 | 0 | 0 | 3 | 15 |
| Mc-Naught Mat. 2 | 5 | 4 | 0 | 1 | 1 | 0 | 2 | 0 | 13 |
| Gandhi Mat. 1 | 5 | 5 | 1 | 1 | 3 | 1 | 0 | 3 | 19 |
| Gandhi Mat. 2 | 5 | 5 | 1 | 1 | 3 | 1 | 2 | 2 | 20 |

provided a low amount of evidence of outstanding teaching. (Def. Mem. ¶ 36; Pl. Opp. at 8, ¶ 45.)  On this issue, NVCC notes McNaught's lack of reference letters and asserts that this was unlike the majority of applicants.  (Def. Mem. ¶ 37)

McNaught, however, raises a few criticisms of the matrices cited by NVCC.  He notes that the two matrices do not contain the same list of applicants' names.  (Pl. Opp. at 11, ¶ 57.)[4]  He also cites deposition testimony by Drs. Sarna, Spencer, and Lechelt which indicates that they did not specifically recall whether they had created the particular matrices in question (Pl. Opp. at 11, ¶ 58), although that testimony also indicates that all of them either recalled using a matrix (Sarna, Spencer) or indicated that that sounded like something they would do, although they did not recall precisely (Lechelt). (Pl. Ex. 24, Sarna Dep. [Dkt. 31-6] 19:8-20:2; Pl. Ex. 23, Spencer Dep. [Dkt. 31-5] 7:1-4, 8:16-22, 11:11-22; Pl. Ex. 22, Lechelt Dep. [Dkt. 31-4] 11:6-9.)

Furthermore, McNaught questions some of the scores applied to him in the matrices: He argues that the highest

---

[4] McNaught also asserts that the matrices used to evaluate him do not contain all of the same rating criteria.  At the hearing, counsel for McNaught only identified one difference: that the first matrix rated the quality of the cover letter submitted from 1 to 4 and the second matrix only noted whether the applicant did or did not submit a cover letter.  The Court notes, however, that a careful review of the matrices demonstrates that this difference did not actually affect the scoring of the candidates because the first matrix stated at its bottom "NOTE: Cover Letter score not part of total." (Def. Ex. 14 [Dkt. 24-3].)  As a result, the categories actually used to score the candidates were the same on both matrices.

possible scores that he received on one of the matrices for both

"teaching experience and relevance" (a 5 out of a possible 0-5)

and "evidence of outstanding teaching" (a 1 out of a possible 0-

1) contradicts NVCC's claim that low evidence of outstanding

teaching was a contributing factor in his non-selection.  (Pl.

Opp. at 11, ¶ 59; Pl. Ex. 14.)  He also argues that the low

scores he received on that matrix for "professional achievement

(academic)" (a 0 out of a possible 0-1) and "professional

achievement (non-academic)" (a 0 out of a possible 0-1) are

inconsistent with the academic and professional achievements he

listed in his application.  (Pl. Opp. at 11, ¶ 60.)  Regarding

the other matrix, McNaught notes that he received a score of 5

out of a possible 5 for "degrees" and a 4 out of a possible 5

for "teaching experience and relevance," and asserts that these

scores are inconsistent with him also receiving a 0 on "evidence

of outstanding teaching" and on "professional achievement

(academic)" on that matrix.  (Pl. Opp. at 11-12, ¶ 61.)

Finally, McNaught criticizes the decision reflected on that

matrix to evaluate his "use of education technology" as 0 out of

3, arguing that he presumably was familiar with NVCC's

technology since he had been teaching at NVCC for five years.

(*Id.*)

McNaught also responds to NVCC's assertion that he

provided low evidence of outstanding teaching by contending that

17

his application stated that he had done exemplary work at NVCC while serving as an adjunct instructor there (Pl. Opp. at 17, ¶ 36), although as noted above, he did not list in support of this assertion any awards for exemplary teaching or provide any references testifying to the excellence of his teaching.  In addition, McNaught notes that two finalists -- McCornac and Biswas -- did not include reference letters in their applications (Pl. Opp. at 17, ¶ 37).

### 3.   Facts Relating to Alleged Retaliation

#### a.   McNaught's EEOC Charges

McNaught filed an EEOC charge, Charge No. 570-2010-1871, on September 20, 2010 and an almost identical charge, Charge No. 570-2010-1805, on October 8, 2010.  These charges alleged discrimination on August 1, 2010 and August 15, 2010, respectively, based on McNaught's age, race, and disability, by NVCC's hiring of an African-American applicant, Mr. Seck, for its Economics faculty.  (Def. Mem. ¶ 55.)

On or around April 13, 2011, NVCC filed a position statement with the EEOC regarding McNaught's 2010 charge arising from his non-selection for the position which Mr. Seck received. (Pl. Opp. at 8, ¶ 43.)

Around September 2011, McNaught filed an EEOC charge in which he alleged national origin discrimination and

retaliation with regard to his non-selection for the position which Dr. Gandhi received.  (*Id.* at 8, ¶ 42.)

> b.   Non-Selection for 2010 Faculty Position
>       Application

The parties agree that McNaught asserts that he was not selected for Position # 1769 in retaliation for his EEOC complaint of non-selection for Position # 1526 (F0R43), a nine-month restricted faculty position.  (Def. Mem. ¶ 44.) Accordingly, McNaught contends that the committee members evaluating applicants for the current position at issue in this case, Position # 1769, were influenced by his EEOC filings in September and October 2010.  (*Id.* ¶ 45.)  McNaught bases this conclusion on the "sequential nature" of the events.  (*Id.* ¶ 46.)  It is also undisputed that the interview and selection committee for the previous faculty position, Position # 1526, consisted of Dr. Elsberg, Brook Miles, and Alex Purugganan, and that neither Drs. Min or Sarna served on that committee.  (*Id.* ¶ 56.)

McNaught presents evidence that Dean McClellan and other NVCC personnel (none of whom were on the selection committee for Position # 1769) were aware of McNaught's 2010 EEOC charge at the time that the selection process for Position #1769 was ongoing, citing their correspondence at that time regarding NVCC's position statement in response to that charge.

(Pl. Opp. at 13-14, ¶¶ 70-72.)  McNaught also points to an email
from Min to the rest of the committee in which Min stated that
McClellan had requested an emergency meeting of the committee on
April 4, 2012 and in which Min requested the committee members
review McNaught's application prior to the meeting.  (Pl. Opp.
at 14, ¶ 73.)  McNaught notes that Min testified that he
believed that McClellan had called the meeting due to McNaught's
potential protests over his non-selection and to ensure due
diligence regarding his application.  (Pl. Opp. at 14, ¶ 74; Pl.
Ex. 7, Min Dep. 27:4-19.)  In addition, McNaught highlights
discrepancies between McClellan's deposition testimony, in which
he stated that he had no recollection of requesting an emergency
meeting or additional review of McNaught's application, and his
declaration, in which he states he now recalls the meeting and
that it was held in order to ensure McNaught's candidacy was not
being overlooked.  (Pl. Opp. at 14, ¶ 75.)

    In addition to allegedly engaging in protected
activity through his EEOC filings, McNaught asserts in his
opposition that he participated in protected activity in his
application for Position # 1769 because he complained about
prior non-selections and other NVCC actions which he perceived
as discrimination in NVCC's hiring.  (Pl. Opp. at 15, ¶ 77.)

    The parties agree that one of the members of the
committee for the position at issue here, Dr. Lechelt,

considered McNaught's cover letter remark for Position # 1769 to
be an unprofessional way to present a job application and
expected positive presentation of an applicant's credentials
rather than a discussion of a campus rumor or past rejections as
an applicant.  (Def. Mem. ¶ 40.)

        c.    Non-Selection for Summer 2012 and Fall
            2012 Adjunct Instructor Positions

Dr. Constance Elsberg is the Assistant Dean for
Liberal Arts and, as such, has had responsibility for the
scheduling of classes led by NVCC's adjunct instructors.  (Def.
Mem. ¶ 47-48.)  Elsberg's practice for scheduling the summer
term classes for the adjunct instructors is that during the
winter, she sends a schedule for the upcoming summer term to her
master list of adjunct instructors and then waits for replies
indicating the adjuncts' interests.  In recent previous years,
McNaught has been included on this list of economics adjunct
instructors.  (*Id.* ¶ 49.)

On February 29, 2012, McNaught emailed Elsberg and
stated that although he did not believe that he previously had
asked for any courses during the upcoming summer 2012 term
because he had not planned on being in Alexandria for that term,
he now was available for that term if NVCC still had an opening
or if another instructor cancelled.  (*Id.* ¶ 50.)  NVCC submits
testimony by Elsberg that she does not recall any openings or

cancellations for teaching that summer and that she made no effort to exclude McNaught. (*Id.*)  Although Elsberg testified that a lack of cancellations was common (Pl. Ex. 5, Elsberg Dep. [Dkt. 29-5] 11:10-15), McNaught contests in his declaration that there were almost always some last-minute cancellations (Pl. Ex. 4, McNaught Decl. [Dkt. 29-4] ¶ 20).

The fall 2012 teaching scheduled preferences also were compiled during February 2012.  (Def. Mem. ¶ 51.)  NVCC submits a declaration from Elsberg in which she indicates that she sent a provisional schedule to McNaught for him to teach ECO 230 in fall 2012, and then delegated completion of the scheduling to Ms. Brook Miles.  In her declaration, Elsberg states that the scheduling was not completed at that time because Miles left the administrative office and a new administrative assistant became responsible for this.  Elsberg presumes that the scheduling of McNaught's class fell through the cracks due to this changeover. In June 2012, she took responsibility for the error in handling his teaching request for the Fall 2012 term.  (Elsberg Decl. [Dkt. 24-1] ¶ 5.)  NVCC asserts that McNaught's previous EEOC complaints and the current lawsuit had no bearing on Elsberg's administration of adjunct hiring.  (*Id.* ¶ 54.)

McNaught submits Elsberg's deposition testimony in which Elsberg initially stated that McNaught did not receive any classes for the Fall 2012 term because she never saw any emails

from him indicating his preferences for that term and then, when presented with an email from him, indicated that she did not remember receiving that email, that she would have otherwise given him courses, and that no one told her not to give him courses.  (Pl Opp. at 18, ¶ 52; Elsberg Dep. 9:5-22, 10:1-8.) McNaught also notes an email exchange between himself and Elsberg in which she also initially asserted that she never received an email with his Fall term class requests and then, after he stated that he believed that he had sent in his requests, stated that he had not been scheduled for that term because all of the adjuncts had not been entered into the fall schedule due to oversight arising from Brooke Miles leaving. (Pl. Opp. at 12, ¶ 65; Def. Ex. 10 [Dkt. 24-3.)  McNaught, however, argues that this explanation is inconsistent with the fact that eight or nine adjuncts ultimately taught classes in the fall of 2012, as Elsberg acknowledged in her deposition. (Pl. Opp. at 12, ¶ 65; Def. Ex. 5, Elsberg Dep. [Dkt. 29-5] 8:17-22, 9:1-4.)

McNaught was scheduled as an adjunct for the current semester at NVCC, the spring 2013 term.  His student evaluations are quite good and his classes generally are full.  (Def. Mem. ¶ 53.)

B.   Procedural Background

On September 12, 2011, Plaintiff filed a charge with the EEOC for national origin discrimination and retaliation for prior protected activity, allegedly arising out of events on December 13, 2010.  [Def. Mem. ¶ 57.]  The EEOC issued Plaintiff a right-to-sue letter for this charge on February 29, 2012. [*Id.* ¶ 58; Am. Compl. ¶ 1.]

Plaintiff filed his Complaint in this Court on May 16, 2012.  [Dkt. 1.]  On July 27, 2012, Plaintiff filed an Amended Complaint.  [Dkt. 5.]  On November 19, 2012, Plaintiff filed a Second Amended Complaint.  [Dkt. 16.]  In his Second Amended Complaint, Plaintiff brought two claims: (1) a national origin discrimination claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") (Count One); and (2) a retaliation claim under Title VII.  [*Id.*]

On January 22, 2013, Defendant filed a Motion for Summary Judgment and accompanying memorandum.  [Dkts. 24-25.] Plaintiff filed his opposition on February 5, 2013 [Dkt. 29], and on February 11, 2013, Defendant replied [Dkt. 32].

Defendant's Motion is before the Court.

## II.   Standard of Review

Summary judgment is appropriate only if the record shows that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."

24

Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996) (citations omitted).  The party seeking summary judgment has the initial burden of showing the absence of a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 248.

Once a motion for summary judgment is properly made and supported, the opposing party must come forward and show that a genuine dispute exists.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The party opposing summary judgment may not rest upon mere allegations or denials.  Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (quotation omitted).

Unsupported speculation is not enough to withstand a motion for summary judgment.  *See Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411-12 (4th Cir. 1986).  Summary judgment is appropriate when, after discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  In reviewing the record on summary judgment, the court "must

draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).

### III.   Analysis

#### A.   National Origin Discrimination Claim

Under Title VII, an employer may not "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin."  42 U.S.C § 2000e-2(a)(1).  A plaintiff may defeat summary judgment and establish intentional discrimination through two methods of proof: (1) through direct or circumstantial evidence that national origin motivated the employer's adverse employment decision; or (2) as in this case, through the burden-shifting framework set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 284 (4th Cir. 2004).

Under the *McDonnell Douglas* framework, a plaintiff first must establish a prima facie case of discrimination by showing by a preponderance of the evidence that: (1) "she is a member of a protected class;" (2) "she applied for the position

26

in question;" (3) "she was qualified for that position;" and (4)
the defendant "rejected her application under circumstances that
give rise to an inference of unlawful discrimination." *Anderson
v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir.
2005).  If the plaintiff establishes a prima facie case, the
burden of production shifts to the defendant to articulate some
legitimate, nondiscriminatory reason for the plaintiff's non-
selection. *Id.*  If the defendant states such a reason, the
burden shifts back to the plaintiff to show that the stated
reason is a pretext for discrimination. *Id.*  A plaintiff may
establish pretext by demonstrating that "the employer's
proffered explanation is unworthy of credence," and the trier of
fact in evaluating pretext may consider "the evidence
establishing the plaintiff's prima facie case 'and inferences
properly drawn therefrom.'" *Reeves v. Sanderson Plumbing
Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dept. of
Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 10, 256
(1981).  "Although intermediate evidentiary burdens shift back
and forth under this framework, '[t]he ultimate burden of
persuading the trier of fact that the defendant intentionally
discriminated against the plaintiff remains at all times with
the plaintiff.'" *Id.* (quoting *Burdine*, 450 U.S. at 253).

     NVCC argues that it is entitled to summary judgment on
McNaught's national origin discrimination claim because (1)

27

McNaught cannot establish a prima facie case of discrimination under the *McDonnell Douglas* framework because (a) McNaught's stated national origin, European, is not a protected classification and (b) the circumstances under which he was rejected for the faculty position do not give rise to an inference of discrimination; and (2) even if McNaught has shown a prima facie case, he fails to rebut NVCC's legitimate non-discriminatory reasons for his non-selection through a showing of pretext.  For the reasons discussed below, the Court finds that McNaught has established his prima facie case but that he has failed to make a showing of pretext sufficient to defeat summary judgment.  As a result, the Court will grant NVCC summary judgment on McNaught's national origin discrimination claim.

### 1. Prima Facie Case

#### a. Whether Europeans Are A Protected Group

NVCC challenges the first element of McNaught's prima facie case, membership in a protected group, by arguing that McNaught's claimed national origin as European does not constitute a protected group.  The Court disagrees with NVCC.

Although courts in the Fourth Circuit do not appear to have addressed this specific alleged national origin previously, based on out-of-circuit case law and general principles from the Supreme Court and the EEOC, the Court concludes that the term

28

"national origin" should be read broadly to provide protection for the national origin of "European."   To begin, in *Espinoza v. Farah Manufacturing* Company, the Supreme Court stated that national origin discrimination under Title VII is discrimination based on "where a person was born, or more broadly, the country from which his or her ancestors came."   414 U.S. 86, 88 (1973). In that same opinion, however, the Supreme Court indicated that national origin did not require identification of a specific country of origin, as it noted that hiring applicants "of Anglo-Saxon background but refusing to hire those of Mexican or Spanish ancestry" or "Spanish-speaking background" would constitute national origin discrimination.   *Id.* at 92 n.5, 95. Accordingly, courts have interpreted the concept of national origin to "embrace a broader class of people" and deemed it "better understood by reference to certain traits or characteristics that can be linked to one's place of origin, as opposed to a specific country or nation."   *Kanaji v. Children's Hosp. of Philadelphia*, 276 F. Supp. 2d 399, 401-02 (E.D. Pa. 2003).   In addition, the EEOC "defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic

characteristics of a national origin group."   29 C.F.R. §
1606.1.

Moreover, other courts have accepted similarly
identified classifications to McNaught's as an acceptable
"national origin" for purposes of a prima facie case.   *See*
*Turney v. Hyundai Const. Equip. USA Inc.*, 482 F. App'x 259, 260
(9th Cir. 2012) (holding that plaintiff who identified as
Caucasian "belongs to a protected class for purposes of his
national origin discrimination claim"); *Stern v. Trustees of*
*Columbia U. in City of N.Y.*, 131 F.3d 305, 306, 312 (2nd Cir.
1997) (finding "white American male of Eastern European origin"
satisfied prima facie case for national origin discrimination);
*Zagaja v. Vill. Of Freeport*, No. 10-cv-3660 JFB WDW, 20120 WL
5989657, at *16 n.7 (E.D.N.Y. Nov. 20, 2012) (allowing plaintiff
to bring national origin claim based on classification as "White
non-Hispanic"); *Hawn v. Executive Jet Mgmt., Inc.*, 546 F. Supp.
2d 703, 711, 716-17 (D. Ariz. 2008) *aff'd*, 615 F.3d 1151 (9th
Cir. 2010) (holding that plaintiff who "identified his national
origin as 'Caucasian American of European descent'" to be a
member of a protected class); *Cameron v. Saint Francis Hosp. &*
*Med. Ctr.*, 56 F. Supp. 3d 235, 238-39 (D. Conn. 1999) (accepting
classification of "white, non-Hispanic male of Scottish/European
origin" as protected class for national origin discrimination
claim).

30

As a result, the Court concludes that McNaught's classification as European constitutes a protected group sufficient to satisfy the first element of his prima facie case.

   b. <u>Whether The Circumstances Of McNaught's Non-Selection Give Rise To An Inference of Unlawful Discrimination</u>

NVCC also asserts that McNaught has failed to show that he meets the last requirement of his prima facie case, that the circumstances of his non-selection for the faculty position give rise to an inference of discrimination.

In order to analyze this requirement, the Court first must resolve whether the standard application of this *McDonnell Douglas* factor applies here or whether the reverse discrimination nature of this case requires McNaught to make an enhanced showing to meet this factor.  It is well-established that in order to satisfy this prong in an ordinary discrimination case, a plaintiff only needs to show that the position was filled by an applicant outside of the plaintiff's protected group.  *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186-87 (1989) (requiring plaintiff to show that "after she was rejected respondent either continued to seek applicants for the position, or, as is alleged here, filled the position with a white employee"); *Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994) (holding that "[t]o satisfy the fourth prong [that "plaintiff was rejected for the position under circumstances

31

giving rise to an inference of unlawful discrimination"], [the African-American plaintiff] . . . need only show that the position was filled by a white applicant").

There exists significant disagreement among courts, however, about how to analyze this factor in cases involving reverse discrimination.  There currently is a widespread circuit split on this issue.  The Sixth, Seventh, Eight, Tenth, and D.C. Circuits require a reverse discrimination plaintiff to show "background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against [majority groups] . . . or evidence that there is something 'fishy' about the facts at hand." *Gore v. Indiana Univ.*, 416 F.3d 590, 592 (7th Cir. 2005); *see Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004); *Hammer v. Ashcroft*, 383 F.3d 722, 724 (8th Cir. 2004); *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004); *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001); *Lanphear v. Prokop*, 703 F.2d 1311, 1315 (D.C. Cir. 1983).  These courts require this enhanced showing because they argue that a reverse discrimination plaintiff "who otherwise makes out a prima facie case is not entitled to an inference of discrimination, because the proof scheme set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is premised upon this country's history of racial discrimination against minority groups, particularly blacks." *Stock v.*

32

*Universal Foods Corp.,* No. 93-1448, 1994 WL 10682, at *3, n. 2
(4th Cir. 1994) (unpublished), *cert. denied,* 115 S .Ct. 66
(1994) (summarizing the position of this set of circuits but not
taking a position itself).

        In contrast, the Third, Fifth, and Eleventh Circuits
hold that the same standard *McDonnell Douglas* prima facie test
applies in both ordinary discrimination and reverse
discrimination cases.  *See Bass v. Board of County
Commissioners*, 256 F.3d 1095, 1103-1104 (11th Cir. 2001); *Byers
v. Dallas Morning News*, 209 F.3d 419, 426 (5th Cir. 2000);
*Iadimarco v. Runyon*, 190 F.3d 151 (3rd Cir. 1999); *Wilson v.
Bailey*, 934 F.2d 301, 304 (11th Cir. 1991).  In support of
applying the same prima facie test to all plaintiffs, the
Eleventh Circuit argued that "[d]iscrimination is discrimination
no matter what the race, color, religion, sex, or national
origin of the victim" and that "[r]acial discrimination against
whites is just as repugnant to constitutionally protected values
of equality as racial discrimination against blacks." *Bass*, 256
F.3d at 1103 (citing *McDonald v. Santa Fe Trail Transp. Co.*, 427
U.S. 273, 280 (1976) (holding that Title VII prohibits
discrimination against whites as well as non-whites); *Plessy v.
Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting)
("Our constitution is color-blind, and neither knows nor
tolerates classes among citizens.  In respect of civil rights,

33

all citizens are equal before the law."); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 239 (1995) (Scalia, J., concurring) ("In the eyes of government, we are just one race here.  It is American."); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 289-90 (1978) (Powell, J., plurality opinion) ("The guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color.")).  In rejecting the "background circumstances" requirement, the Third Circuit argued that this requirement was "irremediably vague and ill-defined."  *Iadimarco*, 190 F.3d at 161.  It also concluded that the requirement was "problematic" because the resulting heightened burden from such a requirement "has a tendency to force the plaintiff to initially present proof that would otherwise only become relevant to rebut the employer's explanation of the challenged conduct" and "can undermine the basic point of the *McDonnell Douglas* burden-shifting regime to make it easier for employees to bring claims that would otherwise be extraordinarily difficult to prove."  *Id.* at 161-63.

The Fourth Circuit has not taken a position officially on this issue and, in fact, repeatedly has refused to do so.  *See Weeks v. Union Camp Corp.*, 2000 WL 727771, at *6 n.13 (4th Cir. June 7, 2000) (unpublished) (acknowledging that "[w]e have not taken a position on this issue"); *Stock,* 1994 WL 10682, at

34

*3, n. 2 (4th Cir. 1994) (unpublished), *cert. denied,* 115 S. Ct. 66 (1994) (finding that "[w]e do not have to resolve this issue here"); *Lucas v. Dole,* 835 F.2d 532, 534 (4th Cir. 1987) ("Although the D.C. Circuit has imposed a higher prima facie burden on majority plaintiffs, we expressly decline to decide at this time whether a higher burden applies."). In the absence of an official position by the Fourth Circuit, an intra-circuit split has formed among the district courts. *Compare Moore v. Rural Health Services, Inc.*, No. CIV.A.1:04 376 RBH, 2007 WL 666796, at *9 n.9 (D.S.C. Feb. 27, 2007) (applying the standard *McDonnell Douglas* test and refusing to require an enhanced showing of background circumstances that support the suspicion that the defendant is that unusual employer who discriminates against majority groups) and *Stock v. Universal Foods Corp.*, 817 F. Supp. 1300, 1305-06 (D. Md. 1993) (same) *with Adams v. High Purity Sys. Inc.*, 1:09CV354 (GBL), 2009 WL 2391939 (E.D. Va. July 2, 2009) (imposing such a requirement), *aff'd sub nom. Adams v. High Purity Sys., Inc.*, 382 F. App'x 269 (4th Cir. 2010) and *Gilbert v. Penn-Wheeling Closure Corp.*, 917 F. Supp. 1119, 1126 (N.D. W.Va. 1996) (same).

     After reviewing the cases on both sides, the Court concludes that it will apply the standard *McDonnell Douglas* test and will not require McNaught to make an enhanced showing. The Court finds the extra or enhanced showing required by the Sixth,

Seventh, Eighth, Tenth, and D.C. Circuits is "vague and
difficult to apply." *Stock*, 817 F. Supp. at 1306; *see
Iadimarco*, 190 F.3d at 161-63 (finding the enhanced test to be
"irremediably vague and ill-defined" and problematic in
application).  In contrast, the standard "*McDonnell Douglas* test
is well-established" and "generally understood." *Stock*, 817 F.
Supp at 1306.  Moreover, the Court believes that application of
the same test to both "ordinary" discrimination plaintiffs and
"reverse" discrimination plaintiffs better reflects overarching
principles expressed by the Supreme Court. *See Bass*, 256 F.3d
at 1103 (refusing to adopt enhanced test for these reasons).
For example, in *McDonald v. Santa Fe Trail Transportation
Company*, the Supreme Court made clear that Title VII prohibited
reverse discrimination "on the same terms" as discrimination
against minority groups.  427 U.S. 273, 280 (1976).  In
addition, the Fourth Circuit has acknowledged that the Supreme
Court has held that the "same 'exacting judicial examination' is
applicable to any classification on the basis of race,
regardless of the type, purpose, or alleged victim of the racial
distinction" and that the "level of scrutiny does not change
merely because the challenged classification operates against a
group that historically has not been subject to governmental
discrimination." *Hayes v. North State Law Enforcement Officers
Ass'n*, 10 F.3d 207, 212 (4th Cir. 1993) (quoting *Wygant v.*

*Jackson Bd. of Educ.*, 476 U.S. 267, 273 (1986)). For these reasons, the Court will apply the ordinary *McDonnell Douglas* test to McNaught.

Under the standard application of the *McDonnell Douglas* test, McNaught easily satisfies the prima facie case requirement to show that the circumstances of his non-selection for the faculty position give rise to an inference of discrimination; he solely must show that that the position for which he was rejected was filled by an applicant outside of the his protected group. *Carter*, 33 F.3d at 458. As discussed above, McNaught identifies his protected group as European national origin. In addition, it is undisputed that Dr. Gandi has a national origin classification of Indian ancestry, a different national origin than McNaught. Therefore, McNaught has satisfied the final prong of his prima facie.

### 2. Legitimate Non-Discriminatory Reason

As the Court concludes that McNaught has met his prima facie case for national origin discrimination, the burden of production now shifts to NVCC to articulate a legitimate non-discriminatory reason for its failure to select McNaught for the faculty position. The Court finds that NVCC has met its burden here. NVCC asserts that its selection committee sought an outstanding teacher for the position and that the committee ultimately determined that Dr. Gandi was the best candidate

based on her qualifications presented in her application, her
corresponding high evaluation matrix score, and her interview
performance.  Relatedly, NVCC asserts that the selection
committee determined that McNaught had provided low evidence of
outstanding teaching and that it evaluated his application
overall as scoring too low on the matrices to merit an interview
as a finalist for the faculty position.  These are sufficient
legitimate non-discriminatory reasons for not selecting McNaught
for the faculty position.  *See Anderson v. Westinghouse Savannah
River Co.*, 406 F.3d 248, 268-69 (4th Cir. 2005) (accepting as a
legitimate non-discriminatory reason that an "interview panel
chose [a candidate other than the plaintiff] to receive the
promotion because she was the '[b]est candidate based on quals.
and interview'" and noting the differences in scores on the
rating matrix between the selected candidate and the plaintiff);
*Stevens v. Anne Arundel County Bd. of Educ.*, 2009 WL 3806374, at
*3 (D. Md. November. 12, 2009) (accepting as a legitimate non-
discriminatory reason that a defendant's "decision not to
promote [plaintiff and promote another candidate instead] was
based on the unbiased recommendation of the interview panel").
Accordingly, the Court concludes that NVCC has met its burden
and rebutted the legal presumption of discrimination which
McNaught's prima facie case had established.

38

3.   <u>Pretext</u>

Since the Court has found that NVCC has met its burden
to produce a legitimate, non-discriminatory reason for its non-
selection of McNaught for the faculty position, in order to
defeat summary judgment McNaught must show that a reasonable
jury nonetheless could conclude that NVCC's stated reasons
actually were pretext.  The Court concludes that McNaught fails
in this effort.

As noted previously, a plaintiff may establish pretext
"by showing that the employer's proffered explanation is
unworthy of credence" using "the evidence establishing the
plaintiff's prima face case 'and inferences properly drawn
therefrom.'"  *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S.
at 255 n.10).  Although "proof that 'the employer's proffered
reason is unpersuasive, or even obviously contrived, does not
necessarily establish that the plaintiff's proffered reason
. . . is correct,' the Supreme Court has made clear that in
appropriate circumstances "'rejection of the defendant's
proffered reasons will permit the trier of fact to infer the
ultimate fact of intentional discrimination,'" that is, "the
trier of fact can reasonably infer from the falsity of the
explanation that the employer is dissembling to cover up a
discriminatory purpose."  *Reeves*, 530 U.S. at 146-47 (quoting
*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 524

39

(1993)).  As the Supreme Court noted, "once the employer's
justification has been eliminated, discrimination may well be
the most likely alternative explanation, especially since the
employer is in the best position to put forth the actual reason
for its decision."  *Reeves*, 530 U.S. at 147.  As a result, "a
plaintiff's prima facie case, combined with sufficient evidence
to find that the employer's asserted justification is false, may
permit the trier of fact to conclude that the employer
unlawfully discriminated," and allow the plaintiff to show a
genuine dispute of material fact sufficient to defeat summary
judgment.  *Id.* at 148.

     As noted by McNaught, one way a plaintiff can show
that an employer's stated reasons are unworthy of credence is by
demonstrating that the employer "has offered different
justifications at different times for its failure to hire" the
plaintiff.  *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852-
53 (4th Cir. 2001); *Dennis v. Columbia Colleton Medical Center,
Inc.*, 290 F.3d 639, 646 (4th Cir. 2002) (finding evidence of
falsity where employer "provided inconsistent justifications for
his promotion" of the selectee); *Johnson v. City of Charlotte*,
229 F. Supp. 2d 488, 496 (W.D. N.C. 2002) (same); *see also
Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st
Cir. 2000) ("[W]hen a company, at different times, gives
different and arguably inconsistent explanations, a jury may

infer that the articulated reasons are pretextual."); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext.").

The Court, however, concludes that McNaught has failed to present sufficient evidence for a jury to conclude that NVCC's asserted reasons for his non-selection were false.  In order to show pretext, McNaught first asserts that NVCC's claim that his application provided low evidence of outstanding teaching was false because: (a) the members of the selection committee provided differing definitions of this application evaluation category; and (b) he believes that he sufficiently had demonstrated his commitment to teaching excellence by listing his extensive teaching experience in his application and that the committee could have chosen to sit in on his then-current NVCC classes or to independently review his NVCC student evaluations (which he did not provide or mention in his application).  Second, McNaught asserts the falsity of NVCC's claim that he did not receive an interview because he did not receive sufficiently high matrix scores, arguing that the provided matrices and his scores on them are suspect.

Contrary to McNaught's assertion, the Court finds that he has not shown that NVCC provided substantively inconsistent explanations of its claims that it sought to hire the best

candidate and an excellent teacher, that McNaught's application
in general did not score sufficiently high for him to become a
finalist and receive an interview, and that his application in
particular provided a lower amount of evidence of outstanding
teaching.  At the very beginning of the selection process, NVCC
made clear in the job announcement for the faculty position at
issue that "[s]uccessful candidates will demonstrate a
commitment to teaching excellence." (Def. Ex. 3.) Accordingly,
one of the categories on which candidates were scored in the
evaluation matrix was "evidence of outstanding teaching," a
category which was distinct from the candidates' degree
credentials and the candidates' amount or longevity of teaching
experience and relevance of that teaching experience as
indicated by the presence of separate matrix categories titled
"degrees" and "teaching experience and relevance." (*See* Def.
Exs. 14, 15.)  In a summary of the various reasons for non-
selection of all of the rejected candidates for Position #
F0874, on a form created after the selection process was
finished, NVCC listed that McNaught had "low evidence of
outstanding teaching." (Pl. Ex. 21 [Dkt. 31-3] at 2.)  A
comparison of the matrix scores for "evidence of outstanding
teaching" of McNaught and the candidate hired, Gandhi, is
consistent with this explanation.  Out of a score range of 0 to
1, McNaught received one score of 0 and one score of 1 in this

42

category whereas Gandhi received two scores of 1.  (Def. Exs. 14, 15.)  Gandhi therefore received a higher score on this category across the two matrices.

Moreover, the Court disagrees with McNaught's claim that the members of the selection committee's definitions of "evidence of outstanding teaching" demonstrate that NVCC has offered inconsistent explanations of this reason for McNaught's non-selection.  Based on the Court's review, it finds that while each selection committee described the requirement of "evidence of outstanding teaching" in his or her own words, the explanations clustered around a consistent narrative: that the candidates should provide documentation of the *quality* of their teaching, documentation which could include great teaching references, high marks from colleagues, good student evaluations, and teaching awards.  (Pl. Ex. 7, Min Dep. [Dkt. 29-7] at 13:5-15; Pl. Ex. 22, Lechelt Dep. [Dkt. 31-4] at 16:2-10; Pl. Ex. 23, Spencer Dep. [Dkt. 31-5] at 18:19-22, 19:8-20; Pl. Ex. 24, Sarna Dep. [Dkt. 31-6] 12:15-19, 13:2-14.)  As a result, the variations in each committee member's definition of a core selection characteristic are not the same as an employer offering inconsistent and constantly shifting explanations for its hiring decision.  The former is a natural result of multiple individuals coming together to evaluate a candidate and reach a

consensus decision based on a mix of subjective[5] and objective factors; the latter is more indicative of post-hoc reasoning and pretext.

Finally, the Court notes that McNaught's remaining arguments for the falsity of NVCC's justifications -- that he sufficiently had provided evidence of his commitment to teaching excellence, that the selection committee could have sat in on his classes or independently requested his student evaluations from NVCC, and his critiques about the matrix scores he received for various evaluation categories -- rely in essence on his own assessment of how his qualifications and application should have been evaluated by NVCC. Such arguments are insufficient to raise a genuine issue of material fact. As courts in this circuit have noted, "with respect to the opinions of qualifications, 'it is the perception of the decision maker that is relevant, not plaintiff's perception of [the other candidate's] qualifications or his own.'" *Bianchi v. Old Dominion Univ.*, No. 2:08CV250, 2009 WL 8724864, at *10 (E.D. Va. May 1, 2009) (quoting *Laber v. Rumsfeld*, 2003 WL 23641779, at *5 (E.D. Va. Oct. 8, 2003)); *see DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). McNaught "cannot establish [his] own criteria for judging [his] qualifications for the

---

[5] The Court notes that on its own, the use of subjective criteria in evaluating candidates does not prove a violation of Title VII. *Mallory v. Booth Refrigeration Supply Co., Inc.*, 882 F.2d 908, 910 (4th Cir. 1989).

promotion." *Anderson*, 406 F.3d at 269.  He "must compete for
the promotion based on the qualifications established by [his]
employer." *Id.; see Jiminez v. Mary Washington Coll.*, 57 F.3d
369, 383 (4th Cir. 1995) ("The crucial issue in a Title VII
action is an unlawfully discriminatory motive for a defendant's
conduct, not the wisdom or folly of its business judgment.").
As evidence provided in his application of the quality of his
teaching, McNaught solely points to his listing of his longevity
in teaching.  This, however, was not primarily what the
selection committee indicated it was seeking as documentation of
the quality of the candidates' teaching.  In addition, while
McNaught claims that the committee could have sought out
additional information beyond his application for evidence of
the quality of his teaching, this was contrary to NVCC's
standard due diligence procedure.  (Min Dep. at 14:16-22.)
Indeed, McNaught does not dispute NVCC's assertion that after
the time for submitting applications had closed, the committee
did not solicit or accept additional information as a matter of
fairness to all applicants.  (Def. Mem. ¶ 38.)  In contrast to
McNaught, Gandhi provided documentation of the quality of her
teaching ability in her application by including strong
reference letters (letters which also provided positive student
evaluations of her teaching) and noting the Junior Faculty Award
for Teaching Excellence which she had received at her prior

school.  (Pl. Ex. 15, Gandhi App. [Dkt. 30-3].)  Finally, based on the committee's assessment of the candidates' qualifications and application using the same standard rating forms, McNaught did not score high enough to qualify for a finalist interview or ultimate selection for the position, whereas Gandhi did.  *See Anderson*, 406 F.3d at 270 (noting that "the deciding factor in the promotion decision was the rating for core and functional competencies that each applicant" received and that a "comparison of the two rating forms, compiled by the same interview panel, indicates that the panel found [the selected candidate] to be the superior candidate").  McNaught's own opinion about how he should have scored on these categories is just that, his own opinion, which is not enough to create a genuine dispute about the truth of NVCC's non-discriminatory reasons.

Ultimately, this Court does "not sit as a 'super-personnel department weighing the prudence of employment decisions' made by the defendant[]."  *Id.* at 272 (quoting *DeJarnette*, 133 F.3d at 299).  Indeed, the Fourth Circuit has made clear that this concern is heightened in the context of faculty hiring.  Courts in this circuit must "review professorial employment decisions with great trepidation" and be "always cognizant of the fact that professorial appointments necessarily involve 'subjective and scholarly judgments,' with

46

which we have been reluctant to interfere." *Jiminez*, 57 F.3d at

376 (quoting *Smith v. U.N.C.*, 632 F.3d 316, 345-57 (4th Cir.

1980)).   It is important that courts "not substitute their

judgment for that of the college with respect to the

qualifications of faculty members for promotion and tenure" as

> [d]eterminations about such matters as
> teaching ability, research scholarship, and
> professional stature are subjective, and
> unless they can be shown to have been used
> as the mechanism to obscure discrimination,
> they must be left for evaluation by the
> professional, particularly since they often
> involve inquiry into aspects of arcane
> scholarship beyond the competence of
> individual judges.

*Id.* at 377 (quoting *Kunda v. Muhlenberg College,* 621 F.2d 532,

548 (3d Cir. 1980)).   As a result, while McNaught may disagree

with how the committee assessed its hiring criteria and

candidates' qualifications, such disagreement is not enough to

show pretext.   The Court therefore will grant summary judgment

on McNaught's national origin discrimination claim.

## B.   Retaliation Claim

Under Title VII, it also is unlawful for an employer

to "discriminate against any of his employees . . . because he

has opposed any practice made an unlawful employment practice by

this subchapter, or because he has made a charge, testified,

assisted, or participated in any manner in an investigation,

proceeding, or hearing under this subchapter."   42 U.S.C. §

47

2000e-3(a).  Under the *McDonnell Douglas* burden-shifting framework, a plaintiff has the initial burden to establish a prima facie case of retaliation by showing: (1) the plaintiff "engaged in a protected activity;" (2) that the defendant "took an adverse employment action against" him; and (3) "that there was a causal link between the two events." *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005).  If the plaintiff establishes his prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory justification for the adverse employment decision.  *Id.* at 405.  If the defendant meets this burden, the plaintiff then has the burden to demonstrate that the defendant's stated reason is pretext.  *Id.*

McNaught alleges two instances of retaliation: (1) his non-selection for the full time faculty position, Position # 1769, and (2) his non-selection for adjunct teaching assignments for the Summer and Fall 2012 terms.  NVCC argues that it is entitled to summary judgment on McNaught's retaliation claim because (1) McNaught cannot establish a prima facie case of retaliation because he cannot show a causal connection between the alleged protected actions and adverse employment actions; and (2) even if McNaught has shown a prima facie case, he fails to rebut NVCC's legitimate non-retaliatory reasons through a showing of pretext.  For the reasons discussed below, the Court

48

will grant NVCC summary judgment on McNaught's retaliation
claim.

1.   Retaliation Through Non-Selection For
     Position # 1769

First, it is unnecessary for the Court to analyze
whether McNaught has shown a prima facie case for this alleged
instance of retaliation because even if he has done so, the
Court finds that he has failed to rebut NVCC's legitimate non-
retaliatory reasons through a showing of pretext.  The adverse
action asserted here, McNaught's non-selection for Position #
1769, is the same adverse action at issue in his national origin
discrimination claim.  Accordingly, NVCC has raised the same
legitimate reasons and McNaught has proffered the same arguments
in support of pretext with respective to this alleged occurrence
of retaliation as each party did regarding the alleged national
origin discrimination.  (Def. Mem. at 26; Pl. Opp. at 23-26).
As already discussed extensively above, the Court finds that
McNaught has failed to raise a genuine issue of material fact
over whether NVCC's reasons for his non-selection for this full
time faculty position were pretext for an unlawful motivation,
whether that motivation was national origin discrimination or
retaliation.

2.   Retaliation Through Non-Selection for Summer
     And Fall 2012 Adjunct Teaching Assignments

Second, the Court concludes that McNaught has failed
to establish a prima facie case of retaliation for his non-
selection for Summer and Fall 2012 adjunct teaching assignments
because he has not shown a casual connection between the alleged
protected activity and the adverse employment actions.

The parties' main dispute as to McNaught's prima facie
case here is the third element, the causal connection between
the alleged protected activity and the adverse employment
actions.  In order to satisfy this element, "the employer must
have taken the adverse employment action *because* the plaintiff
engaged in a protected activity."  *Dowe v. Total Action Against
Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).
The relevant decisionmaker's knowledge of a plaintiff's
protected activity is crucial to showing a connection to that
individual's decision to take the adverse employment action
against the plaintiff.  *Id.* ("Since, by definition, an employer
cannot take action because of a factor of which it is unaware,
the employer's knowledge that the plaintiff engaged in a
protected activity is absolutely necessary to establish the
third element of the prima facie case.")  In this case, it is
undisputed that Dr. Elsberg was responsible for selecting all
adjunct professors.  (Pl. Opp. at 7, ¶ 40.)  As such, she is the

50

relevant decisionmaker responsible for not scheduling McNaught as an adjunct professor for the Summer and Fall 2012 terms, the adverse employment actions at issue here.  McNaught, however, has failed to present any evidence that Elsberg was aware of either of his actions which constitute the relevant protected activity here: his filing of the EEOC charge underlying this case in September 2011 or his filing of the lawsuit in this court in May 2012.  Moreover, at the hearing on this motion, counsel for McNaught could not identify any evidence indicating such knowledge by Elsberg.  Accordingly, the Court concludes that McNaught has failed to establish the necessary causal connection between his protected activity and Elsberg's failure to schedule him as an adjunct professor for the Summer and Fall 2012 terms.  As a result, McNaught fails to make his prima facie case for retaliation and summary judgment on this claim is appropriate.

### IV.   Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment.

An appropriate Order will issue.


/s/
March 20, 2013                    James C. Cacheris
Alexandria, Virginia        UNITED STATES DISTRICT COURT JUDGE